*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WILLIAM WULIGER,

        *Plaintiff-Appellee,*

    *v.*

MANUFACTURERS LIFE INSURANCE COMPANY (USA),

        *Defendant-Appellant.*

No. 08-3342

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 03-07457—David A. Katz, District Judge.

Argued: January 22, 2009

Decided and Filed: May 28, 2009

Before: GUY, CLAY, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Charles J. Vinicombe, DRINKER, BIDDLE & REATH, Princeton, New Jersey, for Appellant. William T. Wuliger, WULIGER, FADEL & BEYER, Cleveland, Ohio, for Appellee. **ON BRIEF:** Charles J. Vinicombe, DRINKER BIDDLE & REATH LLP, Princeton, New Jersey, Stephen D. Lerner, Pierre H. Bergeron, SQUIRE SANDERS & DEMPSEY LLP, Cincinnati, Ohio, for Appellant. William T. Wuliger, WULIGER, FADEL & BEYER, Cleveland, Ohio, Amy A. Wuliger-Knee, Montgomery Village, Maryland, Andrew C. Storar, Michael W. Sandner, PICKREL, SCHAEFFER & EBELING, Dayton, Ohio, for Appellee.

_____

## OPINION

_____

    CLAY, Circuit Judge. Plaintiff William Wuliger (the "Receiver") filed this diversity suit against Defendant Manufacturers Life Insurance Company (USA) ("MLIC") seeking rescission of three insurance policies and the return of premiums paid on them after they

were fraudulently procured for the benefit of a viatical investment company in receivership. MLIC now appeals the district court's order granting summary judgment to the Receiver and denying MLIC's motion for summary judgment. For the reasons that follow, we **REVERSE** the district court's order and **REMAND** with instructions to grant summary judgment dismissing the action against MLIC.

## BACKGROUND

### I.     The Liberte Fraud

Liberte Capital Group ("Liberte"), an Ohio-based "viatical investment company," purchased life insurance policies from "viators"–policyholders who are terminally ill or who are elderly and in poor health–in exchange for paying the viators an up-front lump sum. Liberte persuaded three elderly individuals to purchase life insurance policies from MLIC and immediately assign the policies to Liberte, which would pay the policies' premiums. The viators' purchases of the insurance policies with the intent to re-sell them to Liberte immediately constituted insurance fraud, because the viators never intended to insure their own lives.

Liberte's collusion with the three viators was part of a larger scheme in which Liberte fraudulently procured viators' insurance policies and sold them to almost three thousand investors, who collectively invested almost $100 million in Liberte. *Liberte Capital Group, LLC v. Capwill*, 148 F. App'x 426, 428 (6th Cir. 2005). Liberte contracted with Viatical Escrow Services, LLC ("VES"), an entity controlled by James A. Capwill ("Capwill"), to manage the accounts of the insurance policies it purchased from viators; Liberte assigned its ownership and beneficiary rights in the policies to escrow accounts managed by VES. *Liberte Capital Group, LLC v. Capwill*, 248 F. App'x 650, 651 (6th Cir. 2007). Liberte also entered into contracts with independent brokers to locate investors interested in purchasing stakes of the insurance policies assigned to Liberte and held by VES. Once the brokers had identified potential investors and persuaded them to invest, Liberte then sold stakes in the expected proceeds from the viators' policies to the investors. Liberte, through the brokers, promised the investors a share of the payouts upon the viators' death, in exchange for up-front payments to the VES escrow accounts. Liberte then used the payments to VES to pay the premiums on the viators' policies. Liberte's brokers did not

disclose to the third-party investors that the investors would be purchasing stakes in fraudulently procured insurance policies.

While Liberte was fraudulently acquiring insurance policies from issuers such as MLIC and was, through its brokers, fraudulently inducing investors to purchase shares of the fraudulently procured policies, VES in turn was defrauding Liberte. Capwill, through an investment vehicle he controlled called Capital Fund Leasing, LLC ("CFL"), diverted the funds that were supposed to be held in VES' escrow accounts to various securities brokers, who ultimately lost the funds. *See id.*

In April 1999, Liberte sued VES, CFL and Capwill in the Northern District of Ohio for defrauding Liberte and losing the money that investors had placed in the escrow accounts in exchange for their stakes in the viators' insurance policies. *Id.* In July 1999, the district court placed VES and CFL in receivership, and authorized the Receiver[1] to "oversee and to administer the business and assets of VES and CFL . . . to take and maintain exclusive and complete custody, control and possession of all the assets belonging to VES and CFL."[2] *Id.* (internal quotations omitted). At that time, Liberte was considered a creditor of the received entities, because its own fraud had not yet been discovered, and the escrow accounts that were fraudulently managed by VES, CFL, and Capwill included Liberte's proceeds from sales of the viatical policies to investors.

Shortly after Liberte filed suit against VES, CFL and Capwill, the Securities and Exchange Commission ("SEC") discovered Liberte's fraud. As a result, the United States charged Liberte's chief executive, J. Richard Jamieson ("Jamieson"), with buying and re-selling fraudulently obtained insurance policies through Liberte. *See United States v. Jamieson*, 427 F.3d 394, 399 (6th Cir. 2005). In addition to indicting Jamieson, the government initiated a separate forfeiture action against Jamieson and Liberte, also in the Northern District of Ohio, and obtained a court order enjoining Jamieson and

---

[1] Victor M. Javitch was the original receiver in this action. The district court appointed William T. Wuliger to replace him on January 30, 2006. The two receivers in this action are herein collectively referred to as the "Receiver."

[2] The receivership was subsequently expanded to include Capwill's assets as well. *Liberte*, 248 F. App'x at 652.

Liberte from further defrauding their investors or insurance companies. In October 2000, the district court in the forfeiture action ordered that Liberte's assets were subject to control of the court, and that a receiver would be appointed to dispose of Liberte's remaining assets. In December 2000, Liberte's action against VES, CFL and Capwill was transferred to the district judge in the forfeiture action. With the judge in the forfeiture action now presiding over all of the proceedings at once, the Receiver was authorized to administer the assets of Liberte as well as VES and CFL, and to sue insurance companies to recoup premiums on insurance policies Liberte fraudulently procured, all for the purpose of gathering as much money as possible for Liberte's investors.[3]

With the fraudulent schemes of Liberte and VES unraveling, the premium payments on the three policies that the viators had fraudulently purchased from MLIC in collusion with Liberte–premiums that Liberte had been paying from the funds it had channeled from investors into VES–ceased in 2001.

## II.        The Receiver's Suit Against MLIC

On July 30, 2003, the Receiver initiated this suit against MLIC before the same district court presiding over the Liberte-related litigation, seeking rescission of the three fraudulently procured insurance policies and the return of the premiums Liberte had paid through VES before the premium payments lapsed, plus interest. In the complaint, the Receiver sought a declaratory judgment that the policies are void *ab initio*. The Receiver identified himself in the complaint as "the Receiver for the investors' interests" in both the forfeiture action against Liberte and Liberte's action against the escrow entities. The complaint then referred to the previous orders establishing the

---

[3]Liberte's action against VES, CFL and Capwill, and the government's civil forfeiture action have already led to numerous appeals before this Court. *See Mohnkern v. Prof'l Ins. Co.*, 542 F.3d 157 (6th Cir. 2008); *Liberte Capital Group, LLC v. Capwill*, 248 F. App'x 650 (6th Cir. 2007); *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543 (6th Cir. 2006); *United States v. Jamieson*, 427 F.3d 394 (6th Cir. 2005); *Liberte Capital Group, LLC v. Capwill*, 421 F.3d 377 (6th Cir. 2005); *Liberte Capital Group, LLC v. Capwill*, 148 F. App'x 426 (6th Cir. 2005); *Liberte Capital Group, LLC v. Capwill*, 148 F. App'x 413 (6th Cir. 2005); *Liberte Capital Group, LLC v. Capwill*, 126 F. App'x 214 (6th Cir. 2005); *Liberte Capital Group, LLC v. Capwill*, 99 F. App'x 627 (6th Cir. 2004); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619 (6th Cir. 2003).

receiverships in the United States' action against Jamieson and Liberte, as well as Liberte's action against Capwill, VES and CFL; the complaint "incorporated [the orders] by reference[.]" (Joint Appendix ("J.A.") at 45.) The Receiver's complaint against MLIC conceded that Liberte "solicited previously uninsured individuals who were terminally ill and/or senior citizens in poor health to engage in 'wet ink' viatical sales," and described this conduct as "a fraud perpetrated by Liberte[.]" (J.A. at 46, 48.) The Receiver claimed that MLIC "has been unjustly enriched through the premium payments made with funds obtained from the investors because it assumed no risk with regard to the polic[ies]." (J.A. at 52-53.) The complaint demanded that the insurance premiums already paid to MLIC "be returned to the Receiver for distribution to the Liberte investors." (J.A. at 53-54.)

On August 23, 2004, MLIC filed a motion for summary judgment seeking to dismiss the action against it, and on September 10, 2004, the Receiver cross-moved for summary judgment seeking relief pursuant to its rescission claim. On February 11, 2008, approximately three and one-half years after the parties filed their motions, the district court granted summary judgment to the Receiver and denied MLIC's motion; the court ordered the rescission of the fraudulent policies and the return of the insurance premiums MLIC had received to date, plus interest. In granting summary judgment to the Receiver, the district court first found that the Receiver had standing to sue MLIC, as the representative of "Liberte and the Capwill entities." (J.A. at 85.) The court noted that Liberte was paying MLIC the insurance premiums of the three fraudulent policies after purchasing the policies from the viators, and stated, "[t]o the extent that the [R]eceiver represents the interests of Liberte and seeks to recover those premiums [from MLIC's policies] on its behalf, the Plaintiff has alleged an injury in fact." (J.A. at 85.) After finding that the Receiver had standing to sue, the district court then found that the insurance policies were void *ab initio* and subject to rescission, because the viators lacked an insurable interest when they procured the policies. The court also found the Receiver was entitled to a return of the premiums under a theory of unjust enrichment, because "[t]he payment of premiums on a void policy and retention of those premiums by [MLIC] is contrary to the notions of fairness." (J.A. at 93.) MLIC timely appealed.

**DISCUSSION**

## I.    Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1176 (6th Cir. 1996).   Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  This Court must draw all reasonable inferences in favor of the non-moving party. *See Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *In re Claumet Farm, Inc.*, 398 F.3d 555, 558-59 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

Similarly, "[w]hether a claimant has standing is a question of law that we review *de novo*." *United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007).

## II.    Standing

Standing includes three constitutional requirements: "a plaintiff must show: (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Am. Civil Liberties Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 645 (6th Cir. 2004) (quotations and citations omitted). In addition to the constitutional requirements, a plaintiff must also satisfy three "prudential" standing requirements: (1) a plaintiff must assert his own legal rights and interests, without resting the claim on the rights or interests of third parties; (2) the claim must not be a "generalized grievance" shared by a large class of citizens; and (3) in statutory cases, the plaintiff's claim must fall within the "zone of interests" regulated by

the statute in question. *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999). "These additional restrictions enforce the principle that, as a prudential matter, the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted." *Id.* (quotations and citation omitted). "A plaintiff bears the burden of demonstrating standing and must plead its components with specificity." *Taft*, 385 F.3d at 645.

In the course of the litigation spawned by Liberte's fraud, this Court has previously addressed the doctrine of standing as it applies to equity receivers. *Javitch*, 315 F.3d at 625; *Liberte*, 248 F. App'x at 656. "The general rule is that a receiver acquires no greater rights in property than the debtor had and that, except as to liens in existence at the time of the appointment, the receiver holds the property for the benefit of general creditors under the direction of the court." *Javitch*, 315 F.3d at 625. "Because they stand in the shoes of the entity in receivership, receivers have been found to lack standing to bring suit unless the receivership entity could have brought the same action." *Id.* "Accordingly, when a receiver is appointed over a corporation, the receiver may only assert claims that could have been asserted by the corporation, and the receiver lacks standing to institute action on behalf of investors in the corporation." *Liberte*, 248 F. App'x at 656. Thus, the Receiver could only have standing to sue MLIC if one of the receivership entities–Liberte, VES, or CFL–would have had standing to bring the same suit.

MLIC argues that the Receiver lacks standing in this case because he seeks to assert the rights of Liberte's investors, who are not receivership entities; MLIC contends that because this Court held in *Javitch* and *Liberte* that the Receiver lacked standing to sue on behalf of investors of the receivership entities, the Receiver must also lack standing here. Such an argument misapplies the precise holdings of these precedents.

In *Javitch*, the Receiver commenced suits against the securities brokers who had negligently invested the money that Capwill had diverted from the VES escrow funds to the securities brokers to invest. 315 F.3d at 622. The Receiver purported to sue the securities brokers on behalf of VES, CFL and Capwill, claiming, *inter alia*, that the

brokers had breached the fiduciary duties they owed to VES when they negligently invested the funds.  *Id.* at 622-23.  However, when Capwill opened the brokerage accounts, he had agreed to submit any dispute over the brokerage accounts to arbitration.  *Id.* at 623.  The securities brokers moved the court to compel the Receiver to go to arbitration; the Receiver argued that he was not bound by the arbitration clauses the way Capwill, VES and CFL would have been, and therefore was free to sue the brokers in federal court.  *Id.* at 624.  This Court held that because a court-appointed receiver "stands in the shoes" of the received entity, the Receiver is bound by the arbitration agreements to the same extent VES and CFL were.  *Id.* at 627.

Although this Court in *Javitch* briefly considered a receiver's standing to bring suits on behalf of the receivership entity, the main question in that case was whether the Receiver was bound by the arbitration agreements into which the receivership entities had entered; this Court did not squarely confront a standing problem then because the Receiver undeniably had standing to claim on behalf of VES, CFL and Capwill that the brokers had defrauded these receivership entities.  However, in *Liberte*, this Court applied the principle set forth in *Javitch*–that receivers' legal rights are generally limited to those of the receivership entities–to address the scope of receivers' standing to bring suits.  In *Liberte*, the Receiver claimed that under the district court's order authorizing the receivership, he had the exclusive authority to recoup the lost funds belonging to Liberte's investors from any entity that may have been liable to them–including the brokers who had identified the investors for Liberte and persuaded the investors to invest in the viatical policies.  248 F. App'x at 652-54.  Several of the investors intervened, claiming that the Receiver did not have the right to sue Liberte's brokers, and that they had the right to sue the brokers independently.  *Id.*  This Court held that regardless of the scope of the district court's authorization, the Receiver only had standing to bring claims belonging to the receivership entities, and not claims belonging to third parties–even if the third parties were meant to be the ultimate beneficiaries of the receivership's recovered property.  *Id.* at 656-57.

The Receiver's standing problem in *Liberte* was that none of the receivership entities–VES, CFL, Capwill or Liberte–would have had standing to sue Liberte's brokers for the misrepresentations the brokers made to Liberte's investors, because none of the entities would have been able to claim any tangible injury traceable to the brokers' misrepresentations to the investors. Because the receivership entities all would have lacked standing, and because of the rule that receivers' rights are limited to those of the receivership entities, the Receiver also lacked standing. *Id.*

In contrast to the Receiver's attempt to sue Liberte's brokers for their misrepresentations to Liberte's investors, the Receiver in this case has standing to sue MLIC because at least one of the receivership entities, Liberte, would have standing to bring such an action. First, the Receiver alleges that Liberte suffered an injury in fact: that it paid the premiums on an unenforceable policy, thereby receiving no consideration for its payments.[4] Liberte's alleged injury is fairly traceable to the actions of MLIC, which was informed of the fraud and refused to pay the premiums back. The injury can be redressed by a court order requiring MLIC to return the payments. With respect to prudential considerations, Liberte would be asserting its own rights to recoup the insurance premiums it paid to MLIC, and as the owner and assignee of the policyholders' rights under the contract, it is the only entity in privity of contract with MLIC.

MLIC argues that the Receiver conceded in his complaint that he is not attempting to assert the rights of a receivership entity, but rather is asserting the rights of Liberte's investors. This argument misconstrues the complaint. Although the Receiver stated in his complaint that he is "the Receiver for the investors' interests," (J.A. at 45), and demanded the return of the premiums "for distribution to the Liberte investors," (J.A. at 53-54), the Receiver was only stating that he was taking the action

---

[4]The complaint alleges that Liberte had assigned its ownership and beneficiary rights to the viatical policies to VES. The complaint does not state whether it was Liberte or VES that actually paid the premiums at issue to MLIC, and the record is devoid of any documentation of the premium payments. However, the complaint makes clear that Liberte established VES for the sole purpose of disguising its identity as the assignee of the insurance policies. Any question about whether the proper entity to sue for rescission would be Liberte or VES is irrelevant for the purposes of standing, since both entities are receivership entities on behalf of which the Receiver may bring claims.

for the ultimate benefit of Liberte's investors, who had valid claims to the lost assets. Yet that is precisely the purpose of a receiver: to marshal the receivership entities' assets, to which several parties assert conflicting claims, so that the assets may be distributed to the injured parties in a manner the court deems equitable. *See Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) ("The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary."). This Court has never objected to a receiver's stated goal of retrieving assets for the benefit of a receivership entity's creditors or customers, so long as the receiver only pursues claims that a receivership entity itself could have raised. *See Liberte*, 248 F. App'x at 656 ("[W]hen a receiver is appointed over a corporation, the receiver may only assert claims that *could have been asserted* by the corporation[.]") (emphasis added); s*ee also Javitch*, 315 F.3d at 627 ("[A]lthough the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to the creditors."); *Jarrett v. Kassel*, 972 F.2d 1415, 1426 (6th Cir. 1992) ("[The receiver's] authority was limited to preserving the property of the . . . receivership for [the receivership entity's] customers. In this regard, he had authority to sue on behalf of the receivership itself but had no authority to bring a cause of action on behalf of the individual customers.").

Thus, the district court's finding of standing was proper because it recognized that one of the receivership entities would have had standing to raise the same claim. The district court did not, as MLIC contends, "amend" the receiver's complaint in order to find standing; it simply disregarded the Receiver's statements that his action would serve to benefit Liberte's investors, since those statements were not directly relevant to the standing inquiry. Although the Receiver did not expressly state that his claim was one that could have been brought by a receivership entity, the Receiver did incorporate by reference the court's prior orders establishing the receivership. The court reasonably inferred from the Receiver's reference to that order that he was claiming to act on behalf of one of the receivership entities, albeit for the ultimate benefit of the receivership

entities' investors.   Although the complaint also stated that "the investors, through the Receiver, . . . are entitled to rescission" of MLIC's policies, (J.A. at 52-53), this inartful language does not change the fact that the claims of rescission brought by the Receiver against MLIC are claims that belonged to a receivership entity, and not to the investors.

Finally, MLIC argues that even if the complaint could be construed as bringing a claim belonging to Liberte, Liberte would lack standing because any injuries it could claim were self-inflicted, and therefore not caused in any meaningful way by MLIC.  To demonstrate standing, the plaintiff must show "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  However, the causation requirement in standing is not focused on whether the defendant "caused" the plaintiff's injury in the liability sense; the plaintiff need only allege "injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  Here, the Receiver essentially claimed that because public policy so heavily disfavors these fraudulently procured insurance policies, MLIC was not entitled to collect premiums on the policies, even if it was unaware at the time it issued the policies that the policyholders had fraudulently procured them.  Regardless of the merits of such a claim, the Receiver asserted an injury traceable to MLIC's act of issuing the policies.  Accordingly, the Receiver's complaint meets the causation requirement.

Because the district court properly found that the Receiver has standing to sue MLIC, we proceed to the merits of the Receiver's claim against MLIC.

**III.    Rescission**

A general axiom of insurance law is that a party has no insurable interest in a life insurance policy if, at the time the policy was issued, the policyholder is "directly interested in the early death of the [insured]." *Warnock v. Davis*, 104 U.S. 775, 779

(1881). Ohio courts have adopted this principle.[5] *See Rakestraw v. City of Cincinnati*, 44 N.E.2d 278, 280 (Ohio Ct. App. 1942). Policies lacking an insurable interest at their inception, or where "the insured has interest only in the loss or destruction of the property" are "wager policies" that are against public policy. *Westfall v. Am. States Ins. Co.*, 334 N.E.2d 523, 525 (Ohio Ct. App. 1974).

The Receiver claimed that because the viators knew at the time they purchased their policies that they were going to assign the policies to an entity that had no direct interest in their continued life, the policies were void *ab initio* and subject to rescission. The district court agreed and granted summary judgment to the Receiver. However, under Ohio law, it is well settled that "'a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable *at the insurer's option*.'" *Buemi v. Mutual of Omaha Ins. Co.*, 524 N.E.2d 183, 186 (Ohio Ct. App. 1987) (quoting *Stipoich [Stipcich] v. Metro. Life Ins. Co.*, 277 U.S. 311 (1928) (emphasis added); *see also Metro. Life Ins. Co. v. Felix*, 75 N.E. 941, 943 (Ohio 1905) (noting insured's right to rescind policy and demand return of premiums if policy is void due to lack of insurable interest, but expressly conditioning rescission upon "there being no fraudulent conduct by the beneficiary"); *Keckley v. Coshocton Glass Co.*, 99 N.E. 299, 301 (Ohio 1912) ("[I]t has been held that the want of insurable interest is available only to the insurer[.]"); *Pierce v. Metro. Life Ins. Co.*, 187 N.E. 77, 77 (Ohio Ct. App. 1933) ("The force of the opinion in [*Keckley*] is that the only person entitled to object on the ground that the beneficiary has no insurable interest is the insurance company issuing the policy, and not the parties claiming an interest in the fund."); *Endress v. Ins. Co.*, 1 Ohio Law Abs. 553 (Ohio Ct. App. June 27, 1923) (because insured plaintiff knew at time she paid premiums that she had no insurable interest, she cannot recover paid premiums on void policy); *Low v. Union Cent. Life Ins. Co.*, 6 Ohio Dec. Reprint 1088 (Ohio Dist. Ct. 1881) ("The insured was not in the position to say that his own misrepresentations should void the policy.").

---

[5]The parties agree that Ohio law should apply to the substantive claims.

The Receiver's proposed rule–that an insured who commits insurance fraud may announce the fraud and receive a refund on any premiums paid to date–would have the perverse effect of reducing the defrauders' risk relative to honest policyholders; any defrauder could commit to paying premiums on his fraudulently procured policy knowing that if the premiums ever became unaffordable, he could declare his fraud and receive all of the previously paid premiums back. This Court cannot sanction such an outcome, particularly since Ohio's courts have already spoken with such clarity on the issue.

However, we note that even if the policies were void *ab initio* due to the policy purchasers' fraud and subject to rescission by the purchaser, the defense of unclean hands would still preclude the Receiver from gaining relief. Rescission is an equitable remedy, and equitable claims are subject to the defense of unclean hands. *See Bell v. Turner*, 874 N.E.2d 820, 828 (Ohio Ct. App. 2007) (rescission is equitable remedy); *Marinaro v. Major Indoor Soccer League*, 610 N.E.2d 450, 452 (Ohio Ct. App. 1991) ("[H]e who comes into equity must come with clean hands.") (quotations and citation omitted). Because the Receiver conceded in his complaint that Liberte committed fraud in its procurement of the insurance policies, the equitable defense of unclean hands bars the Receiver's rescission claim.

The district court found the unclean hands defense inapplicable in this case for two reasons. First, the court found that the unclean hands doctrine is inapplicable where the plaintiff's unclean conduct affected third persons, and not the defendant. The application of the unclean hands defense "depends upon the connection between the complainant's iniquitous acts and the defendant's conduct which the complainant relies upon as establishing his cause of action." *McClanahan v. McClanahan*, 72 N.E.2d 798, 800 (Ohio Ct. App. 1946) (quotations and citation omitted). Thus, "[r]elief is not to be denied because of general iniquitous conduct on the part of the complainant or because of the latter's wrongdoing in the course of a transaction between him and a third person." *Id.* (quotations and citation omitted). The district court, in applying this exception, overlooked the fact that Liberte perpetrated a fraud not just against its investors but also

against MLIC; Liberte induced the three viators to fraudulently procure the insurance policies from MLIC, which would have been responsible for paying the policies' proceeds upon the viators' death unless it uncovered the fraud first. The "connection between the complainant's iniquitous acts and the defendant's conduct which the complainant relies upon as establishing his cause of action," *id.*, is thus readily apparent here: the Receiver's entire claim is predicated on MLIC's refusal to return premiums paid to it because of Liberte's fraud. That Liberte also defrauded third-party investors in addition to MLIC is irrelevant. Accordingly, the district court wrongly applied this exception to MLIC's clean hands defense.

The second exception to the unclean hands defense that the district court invoked was the "removed wrongdoer" exception established in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). In *Scholes*, the SEC filed a civil forfeiture action against a defrauder who created three shell corporations, and then established limited partnerships in the corporations for the sole purpose of selling the limited partnerships to investors; under this Ponzi scheme, the defrauder used the proceeds from the sale of new limited partnerships to pay a return to existing investors. *Id.* at 752. The district court presiding over the SEC's action placed the defendant and the shell corporations into receivership, and appointed a receiver to recover the investors' funds, much of which the defendant had diverted to his family and for personal use. *Id.* at 752. The receiver brought suit against several recipients of the defendant's fraudulent conveyances, who then challenged the receiver's standing to sue them on behalf of the corporations, arguing that the corporations had only been pawns of the defendant and therefore suffered no injury. *Id.* at 753-54. The court held that the receiver sufficiently alleged an injury because the appointment of the receiver "removed the wrongdoer from the scene," and that the corporations he used, having been freed from his wrongdoing, were entitled to seek the recovery of the assets they had fraudulently conveyed. *Id.* at 754. The court went on to consider the merits of the receiver's claims pursuant to a state fraudulent-conveyance statute. *Id.* at 755.

The district court, citing *Scholes*, found that because Jamieson had been removed as Liberte's chief executive, Liberte had been freed of all wrongdoing and was not subject to the unclean hands defense. The district court's application of the *Scholes* exception was incorrect. Unlike in *Scholes*, where the corporation's culpability could be foisted onto one individual who appeared to have single-handedly created these shell corporations and the ensuing Ponzi scheme, there is no evidence in the record that Liberte's fraud can be attributed in its entirety to Jamieson. The Receiver's complaint, in describing Liberte's fraud, does not even mention Jamieson, stating instead that "[t]he causes of action set forth herein arise from the viatical business that Liberte Capital Group or its agents have transacted in Ohio with various insurance companies including Defendants[.]" (J.A. at 46.) Without any evidence in the record of Jamieson's role in Liberte's scheme, or of the degree to which Liberte was a shell controlled entirely by Jamieson, this Court cannot similarly conclude that separating Jamieson from Liberte wiped Liberte's slate clean. Moreover, once the court in *Scholes* found that the receiver had standing to act on behalf of the corporations, it analyzed the merits of the receiver's claims under a state statute, and therefore never considered whether the unclean hands defense would apply to the merits of the receiver's claims. Accordingly, the exception articulated in *Scholes* is not applicable here.

Rather, under this Court's long-recognized "stand-in-the-shoes" doctrine, *Javitch*, 315 F.3d at 627, the Receiver's rights as a plaintiff are subject to the same claims and defenses as the received entity he represents, and not third-party beneficiaries. *See Jarrett*, 972 F.2d at 1426; *see also Scholes*, 56 F.3d at 753 ("Like a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, an equity receiver may sue only to redress injuries to the entity in receivership[.]"). Thus, as Liberte's successor-in-interest, the Receiver is precluded by Liberte's unclean hands from bringing the rescission claims.

In sum, the district court should have granted summary judgment to MLIC with respect to the Receiver's rescission claim. Liberte's fraud precluded the Receiver, whose claims were limited to those of Liberte, from using the fraud to gain rescission

of the viators' policies.  Yet even if such a claim could have merit under Ohio law, Liberte's unclean hands would preclude any relief.

## IV.     Unjust Enrichment

Although the Receiver did not bring an unjust enrichment claim, the district court nevertheless concluded that "the Plaintiff is entitled to the return of premiums under the theory of unjust enrichment." (J.A. at 93.)  While the complaint stated in two different places that MLIC has been "unjustly enriched," it did so in the context of its rescission claim, and did not raise a separate unjust enrichment claim.  (J.A. at 52, 53.)  In his motion for summary judgment, the Receiver's only argument concerning unjust enrichment was that "[b]ecause the [three viators'] policies were void *ab initio*, [MLIC] will be unjustly enriched if it is permitted to keep the premiums paid on those policies." (J.A. at 184.)  Thus, to the extent that the Receiver even asserted an unjust enrichment claim, the claim appeared to be predicated on the faulty premise that the policies were void *ab initio* as a result of their fraudulent procurement.  We therefore believe it was improper for the district court to treat the Receiver's unjust enrichment claim as independent of the rescission claim.

Regardless, any unjust enrichment claim would fail on its merits.  To establish unjust enrichment, a plaintiff must demonstrate "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment[.]" *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984) (quotations and citation omitted).  "Recovery under unjust enrichment is designed to compensate the plaintiff for the benefit he has conferred upon another, not to compensate him for a loss suffered." *Jones v. Jones*, No. 13-08-16, 2008 WL 4965164, at *7 (Ohio Ct. App. Nov. 24, 2008).  "Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates *in the absence of an express contract or a contract implied in fact* to prevent a party from retaining money or benefits that in justice and equity belong to another." *Beatley v. Beatley*, 828 N.E.2d 180, 192-93 (Ohio Ct. App. 2005) (quotations and citations omitted) (emphasis added).  Thus, "Ohio law is clear that

a plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject." *Lehmkuhl v. ECR Corp.*, No. 06 CA 039, 2008 WL 5104747, at *5 (Ohio Ct. App. Dec. 2, 2008).

Because the Receiver's claim is based upon express contracts–i.e., the insurance policies issued to the three viators–and the premiums at issue were paid pursuant to the contracts, the facts of this case cannot support an unjust enrichment claim. The Receiver has not demonstrated any evidence of a benefit conferred; the payment of premiums to MLIC was not a "benefit" conferred on MLIC, but was consideration for MLIC's commitment to insuring the viators' lives. Accordingly, even presuming the Receiver intended to state an unjust enrichment claim, such a claim would be without merit. *See Lehmkuhl*, 2008 WL 5104747, at *5; *Beatley*, 828 N.E.2d at 192-93.

## CONCLUSION

For the foregoing reasons, this Court **REVERSES** the district court's order granting summary judgment to the Receiver, and **REMANDS** to the district court with instructions to enter summary judgment dismissing the action against MLIC.